| **Kliger v Fairmont Ins. Brokers LLC** |
| --- |
| 2026 NY Slip Op 30863(U) |
| March 4, 2026 |
| Supreme Court, Kings County |
| Docket Number: Index No. 505356/2023 |
| Judge: Reginald A. Boddie |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Commercial Part 12 of the Supreme Court of the State of New York, held in and for the County of Kings, at the Courthouse, located at 360 Adams Street, Borough of Brooklyn, City and State of New York on the 4th day of March 2026.

P R E S E N T:
Honorable Reginald A. Boddie
Justice, Supreme Court

-------------------------------------------------------------------x

MORDECHAI KLIGER,

                Plaintiff,

        -against-

FAIRMONT INSURANCE BROKERS LLC, formerly known as FAIRMONT INSURANCE BROKERS, LTD.,

                Defendant.

-------------------------------------------------------------------x

FAIRMONT INSURANCE BROKERS LLC, formerly known as FAIRMONT INSURANCE BROKERS, LTD.,

                Third-party Plaintiff,

        -against-

BAYROCK INSURANCE AGENCY, LLC; THE FIDELLA AGENCY LLC d/b/a THE FIDELLA INSURANCE AGENCY, STERLING PROPERTY AND CASUALTY INC., CREATIVE INSURANCE GROUP, LLC, and DAVID DREBIN,

                Third-Party Defendants.

-------------------------------------------------------------------x

Index No. 505356/2023

Cal. No. 8-12     MS 24-28

**Decision and Order**

The following e-filed papers read herein:

| | NYSCEF Doc Nos. |
|---|---|
| MS 24/28 | 617-647; 719-721; 732-740 774-775 |
| MS 25 | 606-616; 741-743; 777 |
| MS 26 | 648-677; 722-731; 778-788 |
| MS 27 | 678-716; 744-773; 776 |

1

[* 1]

The separate motions seeking summary judgment dismissing the third-party complaint and awarding sanctions against defendant/third-party plaintiff, Fairmont Insurance Brokers LLC ("Fairmont"), by third-party defendant/counterclaimant Sterling Property and Casualty Inc. ("Sterling") (MS 25) and third-party defendant Bayrock Insurance Agency, LLC ("Bayrock") (MS 24 and 28); the motion by plaintiff, Mordechai Kliger ("Kliger"), and third-party defendants, Creative Insurance Group, LLC ("Creative") and David Drebin ("Drebin" and collectively with Kliger and Creative, "Kliger Parties"), seeking summary judgment as to liability against Fairmont on the causes of action asserted in the second amended complaint ("SAC") and dismissing Fairmont's third-party complaint against Creative and Drebin (MS 26); and Fairmont's motion seeking, among other relief, summary judgment against Kliger on the remaining claims in the SAC and judgment in its favor on the issue of liability for breach of the parties' agreement (MS 27), are decided as follows:

## Background

Fairmont is an insurance brokerage firm in the business of procuring insurance policies for its clients. Fairmont employs a network of "Associate Producers" who use Fairmont's resources and systems to help obtain and maintain clients for Fairmont. In November 2004, Kliger began working with Fairmont as an Associate Producer. On or about February 18, 2005, Kliger and Fairmont entered into an agreement entitled the Associate Producer Agreement ("APA").

According to the SAC, under the APA, Kliger, acting as an independent contractor, agreed, *inter alia*, to submit all original and renewal insurance business solicited or otherwise secured by him during the term of the APA to Fairmont for placement with insurers. In return, Fairmont agreed, *inter alia*, to use its best efforts, to place policies of insurance as and when requested by Kliger and to provide Kliger with "Supporting Services." Fairmont agreed to compensate Kliger

2

[* 2]

for each insurance policy placed by Kliger through Fairmont by paying Kliger "forty (40) percent of the 'gross commission'" on each policy, while also providing that "[t]he parties may agree to a different percentage rate for special types or classes of business and coverage" (APA, § 17). Kliger represents that, in accordance with the final sentence of § 17 of the APA, more than ten years ago, the parties agreed that Fairmont would compensate Kliger at a different percentage rate – 45% of gross commission – for all classes of insurance placed by Fairmont at Kliger's request, and Fairmont has been compensating Kliger at that rate ever since. It is undisputed that, under § 24 of the APA, there is a handwritten notation (the "Handwritten Portion") that provides, "If this agreement is terminated without cause, Associate Producer can still maintain book of business and receive 40% commission from this book."

In early January 2023, Kliger was advised that Fairmont intended to sell substantially all of its assets to Foundation Risk Partners, Corp. The sale purportedly required Kliger to sign a series of draft agreements, which he declined to do. On or around February 14, 2023, Fairmont provided Kliger notice that it was terminating the APA without cause effective March 23, 2023.

On February 17, 2023, Kliger commenced this action arguing that Fairmont breached the APA by prematurely curtailing Kliger's access to Fairmont's Agency Management System ("AMS"), which electronically stores insurance client information. On February 21, 2023, Kliger moved for a preliminary injunction with temporary restraints seeking to enjoin Fairmont from limiting Kliger's access to AMS and prohibiting Fairmont from "soliciting Plaintiff's insurance clients or otherwise interfering with Plaintiff's contractual right to maintain his book of insurance business and his right to be compensated therefor...." The court signed the order to show cause on February 24, 2023, with a return date of April 6, 2023. In the interim, Fairmont was directed

3

to provide Kliger with complete access to information relating to his insurance clients stored electronically on AMS.

The parties thereafter entered into a stipulation dated April 10, 2023 ("Stipulation"), resulting in the withdrawal of Kliger's order to show cause. Under the Stipulation, each party made certain concessions. Kliger agreed to "not interfere in any way with Defendants' business, other than in connection with the servicing of the Pre-Termination Business;" both sides agreed not to disparage each other or their principals, agents and employees; and with respect to "insurance business solicited or otherwise secured by Plaintiff and placed by Defendant that existed at the time of the termination of the Associate Producer Agreement between the Parties (the "Pre-Termination Business")," Fairmont agreed, among other things, to provide Kliger with access to AMS and "good faith assistance" so that Kliger could maintain and service his Pre-Termination Business.

On May 31, 2023, Fairmont moved by order to show cause seeking to enjoin Kliger from, among other things, communicating with Fairmont's clients, or any insurance providers, brokers, carriers, and/or wholesalers relating to Fairmont's clients and accessing Fairmont's AMS. According to Fairmont, the motion was necessitated due to Kliger's interference with Fairmont's business by using its "confidential information" to convince Fairmont's clients to switch brokers or "cut out the middleman." By decision dated July 14, 2023, Fairmont's motion for injunctive relief was denied. The allegations undergirding Fairmont's motion are the substance of Fairmont's counterclaims against Kliger, which allege that Kliger breached the APA and Stipulation by, among other things, disclosing confidential information, disparaging Fairmont, and inducing Fairmont's clients to switch to a different insurance broker.

4

[* 4]

On or around August 16, 2024, Fairmont commenced an action in New Jersey Superior Court ("New Jersey Action") against Creative, Kliger's solely owned company, and Drebin, Creative's employee. The New Jersey Action was also filed against Bayrock, Sterling, and the Fidella Insurance Agency d/b/a The Fidella Insurance Agency ("Fidella"). Upon a motion by Kliger seeking an injunction enjoining Fairmont from litigating the New Jersey Action pending the resolution of the instant action, by decision dated November 8, 2024, the court granted Kliger's motion and enjoined Fairmont from further litigating the New Jersey Action on the ground that the New Jersey Action and the instant action, which was commenced 18 months earlier, concerned the "same nucleus of facts."

Thereafter, on January 14, 2025, Fairmont filed its third-party complaint against Bayrock, Fidella, Sterling, Creative and Drebin. Fairmont interposed six claims against the third-party defendants: (i) tortious interference with contract; (ii) tortious interference with economic advantage; (iii) unjust enrichment; (iv) violation of the Defend Trade Secrets Act ("DTSA") under 18 U.S.C. § 1836; (v) injunctive and equitable relief; and (vi) common law misappropriation. As against Creative and Drebin, Fairmont asserted an additional claim for alter ego liability, alleging that Creative is a mere corporate instrumentality used for Kliger's benefit. The crux of Fairmont's claim against Bayrock, Sterling and Fidella centers on their alleged assistance to Kliger in inducing or supporting Kliger's breach of his contractual obligations to Fairmont by using Fairmont's confidential information and assisting Kliger in soliciting Fairmont's clients.

Pursuant to court order, the note of issue was filed on January 31, 2025. Given the proximity of the note of issue due date to the commencement of the third-party action, the court permitted limited third-party discovery post-note of issue. Upon motions to dismiss made by third-party defendants, Bayrock, Sterling, and Fidella, by decision dated May 9, 2025, the court

5

[* 5]

dismissed the majority of Fairmont's third-party claims, leaving only the claims for trade secret misappropriation, violation of DTSA, and permanent injunctive relief.

Upon conclusion of discovery for both the main action and the third-party action, nearly all parties filed motions seeking summary judgment. Both Bayrock and Sterling seek summary judgment dismissing the remainder of Fairmont's third-party claims and awarding them judgment on their counterclaim for attorney's fees and costs under the DSTA. Although Bayrock and Sterling filed separate motions for summary judgment, for purposes of judicial efficiency, and given that their legal arguments are substantially similar, the court addresses both motions as one.

*MS 24/25/28: Bayrock and Sterling's Motions for Summary Judgment*

Regarding Fairmont's common law claim for misappropriation of trade secrets, Bayrock and Sterling argue that (1) Fairmont does not have protectible trade secrets; (2) even if Fairmont possessed trade secrets, Bayrock and Sterling did not obtain them by improper means; and (3) Fairmont cannot demonstrate any damages due to any alleged misappropriation.

Referencing the third-party complaint, Bayrock and Sterling state that Fairmont is alleging that its "client contact information, information about the client's properties and business relevant to quoting insurance, renewal dates and specific policy needs" are its trade secrets. Further, that Fairmont's witness testified that the entire way Fairmont conducts business and any "important piece of information" in its business constitutes trade secrets. According to Bayrock and Sterling, New York law fails to protect the foregoing as trade secrets because (1) the way it conducts business lacks the specificity required; (2) information that is readily available through public sources is not subject to trade secret protection; (3) information that is widely accessible within Fairmont to many of its employees and also shared to third parties is not a trade secret; (4) Fairmont did not guard the secrecy of its alleged trade secrets by encrypting its email or even labeling the

6

[* 6]

information as confidential or proprietary; and (5) client information cannot be Fairmont's trade secret since such information belongs to the client and not Fairmont.

Even presuming Fairmont had protectible trade secrets, Bayrock and Sterling argue Fairmont's trade secret claim would still fail for the independent reason that Fairmont does not have any evidence that its purported trade secrets were improperly obtained or used by Bayrock or Sterling. In this regard, Bayrock submits the record in this matter fails to contain a single instance of Bayrock using Fairmont's information, and that Fairmont even acknowledged it had not seen a single email where Bayrock was using one of Fairmont's trade secrets. Bayrock further submits that its witness testified, at its deposition, that there is a perfectly innocent explanation why Kliger was sending Bayrock information about Bayrock's client's prior policies with Fairmont and that is—those emails contained information that came from the client and the client requested Bayrock create a master insurance policy that would cover all of its prior insurance policies.

Similarly, Sterling submits that its witness testified that most, if not all, of former Fairmont clients that did business with Sterling affirmatively reached out to Sterling to do business or change brokerages, with Kliger sometimes forwarding information at the request of the client. Upon a "comprehensive" search of its documents in response to discovery requests from Fairmont, Sterling asserts that only two documents were yielded that contained any information readily identifiable as coming from Fairmont, and that both pertained to a client called Yeshiva Orchos Chaim and consisted of substantially the same information regarding policy renewal. Sterling represents that both communications from Fairmont came to Sterling because they were forwarded by the client. Based on the foregoing, Bayrock and Sterling argue there is no evidence that they

7

misused any of the information that Fairmont asserts is confidential or proprietary, and as such, that the court should dismiss Fairmont's misappropriation of trade secrets claim.

In addition to the foregoing, Bayrock and Sterling contend Fairmont's failure to show any damages from any alleged unlawful conduct bars recovery on its third-party claims and constitutes another basis for summary judgment. In this regard, Bayrock claims Fairmont was not able to testify about any clients who left to go to Bayrock, or even that it lost any revenue at all.

As for Fairmont's cause of action for permanent injunction, where Fairmont's substantive claims are dismissed, Bayrock and Sterling contend there is no basis for injunctive relief. Thus, because Fairmont's misappropriation claim is unsustainable, they submit Fairmont's claim for injunctive relief must also be dismissed.

Lastly, Bayrock and Sterling argue that the court should grant them summary judgment on their counterclaim for attorneys' fees under 18 U.S.C. § 1836(b)(3)(D). They point out that, under the DTSA, where a claim of misappropriation of trade secrets is made in bad faith, a court may award reasonable attorneys' fees to the prevailing party. Based on the lack of any evidentiary support for Fairmont's contentions that either Bayrock or Sterling misappropriated any of Fairmont's trade secrets, or that those trade secrets even existed, movants submit Fairmont's claim is wholly specious and lacking merit.

In opposition to Bayrock's and Sterling's motions, Fairmont contends it has identified specific trade secrets that were misappropriated, including: (i) client contact information that is not readily available to the public and was developed through Fairmont's substantial investment of time and resources; (ii) detailed information about clients' properties and businesses relevant to quoting insurance, which Fairmont compiled through its expertise and client relationships; (iii) renewal dates and specific policy needs tailored to each client's unique circumstances; and (iv)

8

[* 8]

comprehensive client files containing proprietary information about insurance coverage, risk assessments, and pricing strategies. Although basic information may be publicly available, Fairmont asserts that its "proprietary compilation, organization, and analysis of this information is not" and that courts have consistently recognized that compilations of data can qualify as trade secrets even if some components are publicly available. Specifically, Fairmont contends that its AMS is entitled to trade secret protection as Kliger has made abundantly clear throughout this action that he could not properly maintain his clients without accessing Fairmont's AMS and the confidential information contained therein.

Contrary to Bayrock and Sterling's assertions, Fairmont argues that it took reasonable measures to protect its trade secrets, including, but not limited to: (i) limiting access to client information within the company; (ii) requiring employees, including Kliger, to sign confidentiality agreements as part of their employment contracts; (iii) maintaining client information in a secure AMS with controlled access; and (iv) implementing company policies prohibiting the unauthorized disclosure of client information. Fairmont contends Sterling's arguments about Fairmont's failure to encrypt emails or mark documents as confidential are misleading since the standard is reasonableness, not perfection. In any event, Fairmont points out that it protected its trade secrets, as evidenced by the fact that Kliger filed this lawsuit and moved to obtain access to AMS.

Regarding Bayrock and Sterling's explanation that they received information directly from clients rather than through misappropriation, Fairmont contends the foregoing is belied by the documentary evidence. In support, Fairmont proffers an email from Kliger to Naftali Rothenberg, co-owner of Sterling, containing an attachment that had a "loss run" that was generated on March 22, 2023, when Kliger was still working for Fairmont. Fairmont also references an email from Kliger to Dov Schwadel ("Schwadel"), owner of Bayrock, containing a 2022 quote to Fairmont on

9

client Springwood Garden, an email from Kliger to Schwadel containing a 2022 insurance binder from Fairmont on client WG FL Portfolio, and Kliger forwarding Fairmont's application for a client to Schwadel as well as loss runs obtained by Fairmont. Fairmont submits Kliger's unauthorized sharing of AMS information to Bayrock and Sterling raises factual disputes as to whether Kliger was violating the APA that cannot be resolved on summary judgment.

Additionally, it is Fairmont's position that Bayrock and Sterling's use of information from Fairmont's AMS sent by Kliger constituted misappropriation since they knowingly obtained information from an individual under a duty to maintain the secrecy of such information. Further, that Fairmont need not demonstrate damages since it is not an element of misappropriation. In any event, Fairmont contends that Sterling never produced documents or records related to premiums and payments that it received from pre-termination clients that left Fairmont and moved their business to Sterling since February 2023.

Regarding Bayrock and Sterling's counterclaims, Fairmont argues that such claims are baseless. Because this action is neither frivolous nor in bad faith, Fairmont contends that their request for attorneys' fees under DSTA is improper.

In reply, Bayrock and Sterling contend that, under the DTSA, the court may award reasonable attorney's fees to the prevailing party "if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence." In this regard, Bayrock and Sterling state that bad faith can be inferred since, among other things, Fairmont never asserted claims against them until the court refused Fairmont discovery related to them, Fairmont is bringing a trade secrets claim on information that it in no way protects from third parties, and Fairmont has failed to show any damages stemming from Bayrock and Sterling's actions.

10

[* 10]

In addition, Bayrock and Sterling re-emphasize that Fairmont lacks any protectible trade secret. They contend that, while Fairmont points to its AMS as a trade secret, Fairmont failed to produce its AMS in discovery and fails to show how its "compilation" is in any way more than an insurance broker's collection of names and addresses, which New York law has long held does not constitute a trade secret. Bayrock and Sterling stress that Fairmont's information is not unique and can be easily duplicated by anyone who receives one of the monthly emails from third parties offering to sell customer lists that would contain this information. They also point out that damages in trade secret actions are measured by the losses incurred by the plaintiff and, here, Fairmont has not provided any evidence of damages. Based on the foregoing, Bayrock and Sterling argue that Fairmont's claims should be dismissed as a matter of law.

*MS 26 and 27: Kliger Defendants' and Fairmont's Motions for Summary Judgment*

Kliger seeks summary judgment on liability on the causes of action asserted in his SAC against Fairmont and to schedule an inquest. Within the same motion, Creative and Drebin seek dismissal of Fairmont's third-party claims against them. Fairmont seeks dismissal of the SAC and an award of partial summary judgment in its favor for breach of contract. Fairmont also seeks an order of preclusion against Kliger under CPLR 3126 for his alleged failure to provide certain discovery.

It is undisputed that the APA includes the Handwritten Portion. According to Kliger, the Handwritten Portion modifies the printed form of the APA, which, at § 21, provides for a "buyout" of Kliger's book of business at specified values. Instead of a buyout, Kliger contends the Handwritten Portion allows Kliger to obtain his regular commissions on his existing book of business. In support, Kliger relies on the rule of construction stating that where a contract contains two repugnant provisions, one printed and the other typewritten or handwritten, the written

11

provision overrides the printed one and controls the interpretation and construction of the contract. In addition, Kliger proffers the deposition testimony of Fairmont employee, Andrew Gross, who states that his understanding of the Handwritten Portion is that Kliger "can still maintain his book of business and receive commission from his book" (EBT Andrew Gross, 136: 18-22). Kliger also explains that it took many months for the APA and Handwritten Portion to be executed because he had to negotiate for its inclusion and it took months for Fairmont to agree to it.

According to Fairmont, Kliger's interpretation of the Handwritten Portion calls for the deletion of numerous paragraphs within the APA and is, therefore, incorrect. Fairmont contends that "book of business" cannot mean the clients procured by Kliger during his tenure at Fairmont because § 16 of the APA provides explicitly that those accounts belong to Fairmont. Fairmont states that pre-termination clients procured by Kliger are referred to as "accounts" or "clients," not Kliger's "book of business." Thus, Fairmont asserts that when "book of business" appears for the first and only time in the Handwritten Portion, it means something else. In this regard, Fairmont argues that "book of business" only refers to new post-termination business that Kliger brings to Fairmont, and that Kliger's insistence that the Handwritten Portion means that Kliger owns the pre-termination book of business is in direct contradiction to, not only § 16 of the APA, but also sections 5, 26, and 7. Fairmont emphasizes that the Handwritten Portion refers to "book of business" and not, as Kliger misleadingly states, *his* book since, under the APA, it is legally impossible for Kliger to have "his" book of business refer to accounts obtained while working for Fairmont.

Fairmont also points out that one of Kliger's primary claims of breach of contract is an allegation that Fairmont breached § 13 ("to use best efforts to place insurance policies") and § 15 ("to provide supporting services to assist Kliger with underwriting") of the APA by withholding

12

[* 12]

full access to information stored on AMS. Fairmont argues that Kliger cannot sustain his claim for indefinite AMS access because it does not exist in the APA, is not mentioned in either § 13 or § 15 of the APA, AMS access was not a contractual obligation even prior to termination, and that, post-termination, given that the "Associate Producer" is the one required to turnover to the "Agency" all financial and other records, there is no contemplation that Kliger would be entitled to access Fairmont's records and documents after termination.

In response, Kliger submits that Fairmont is obligated to provide Kliger access to AMS under the court-ordered Stipulation, which ordered that Fairmont would continue to provide Kliger with full access to Fairmont's AMS. In addition, Kliger argues that because the Handwritten Portion provides that Kliger "can still maintain" his book of business, which means servicing the client, and which can only be achieved by having the client's insurance-related information in hand, AMS cannot be shut off for Kliger.

Regarding its motion seeking partial summary judgment against Kliger, Fairmont contends that Kliger breached the APA and the duty of loyalty[1] by (1) by disclosing confidential information to Creative, Bayrock and Sterling in violation of § 5; (2) by accepting new or renewal business

---

[1] Under section 7 of the APA entitled "Duty of Loyalty to Agency," during the term of the Agreement and for three years thereafter, the Associate Producer is restricted from (i) soliciting or accepting business from existing clients of Fairmont; (ii) inducing or attempting to induce any holder of an insurance policy placed through Fairmont to cancel or transfer coverage; or (iii) inducing or attempting to induce any other producer, employee, correspondent, agent, or independent contractor, to terminate his/her/its relationship with Fairmont or to breach an agreement with Fairmont.

Under section 27 of the APA entitled "Restrictive Covenant," for a period of three years following termination of the Agreement, the Associate Producer is restricted from: (i) soliciting or accepting any new or renewal business from, any client of Fairmont; (ii) inducing or attempting to induce any policy holder from cancelling or transferring insurance coverage; (iii) opening, acquiring or maintaining an insurance business within Brooklyn, New York; (iv) joining or associating in the insurance business with any former associate producers, employees, correspondent, agent or independent contractor; or (v) inducing other associate producers, employees, correspondents, agents or independent contractors to terminate his/her relationship with Fairmont.

13

[* 13]

from Fairmont's clients to his own brokerage, Creative, in violation of § 27; and (3) by soliciting Fairmont's clients to switch to different brokers, including to his own brokerage, Creative. Fairmont submits that its three-year non-solicit and duty of loyalty provisions under the APA are enforceable since the timeframe is reasonable especially considering that the subject non-solicit provision only prevents the employee from soliciting or accepting business from any of Fairmont's clients but does not prevent the employee from pursuing his career.

Fairmont contends that Kliger's breach of the APA is established as Kliger admits, in his deposition testimony, that he has been taking clients since he was terminated, and the record is replete with examples of Kliger taking Fairmont's pre-termination business to Creative. Additionally, Fairmont argues that Kliger was sending Fairmont's confidential information to Fairmont's competitors, like Sterling and Bayrock, as well as to Creative.

In response, Kliger argues that the subject restrictive covenant is unenforceable because (1) Fairmont has not alleged any unique activity or proprietary information that might warrant protection; (2) Fairmont's restrictions span three years from the date of termination, which is two years longer than any acceptable restrictions, and Fairmont offers no compelling reason to justify the lengthy restriction; (3) non-competition restrictions imposed against insurance brokers are contrary to public policy; (4) Fairmont's termination without cause bars enforcement of the restrictive covenants because enforcement would destroy the mutuality of obligation upon which such covenants are based; and (5) Fairmont's breaches of the APA, including withholding Kliger's full commission payments and denying him access to critical client information he was entitled to pre-and post-Stipulation, excuse Kliger's performance under the restrictive covenants and render them unenforceable, also due to the concept of mutuality of obligation.

14

In addition, Kliger argues that the Handwritten Portion undermines any claim that the restrictive covenants are enforceable since the handwritten amendment specifically allows Kliger to collect commission on his pre-existing "book of business," which are clients that have done business with Fairmont in the past and may still be doing business with Fairmont. Moreover, to the extent Fairmont has taken the position that, based on the language of the restrictive covenants, Kliger may not accept former Fairmont clients that come to Creative of their own volition, Kliger submits such an interpretation would impose an unconstitutional ban on a person's right to choose the professional of his choice and is therefore unenforceable.

Although the Handwritten Portion specifies a 40% commission rate, Kliger contends that in the later years of his employ, he received a commission rate of 45% which was payable so long as Kliger generated premiums above $10 million. Kliger argues that, based on the documentary evidence and the testimony of Fairmont representatives, including its CFO,[2] he is entitled to commissions calculated at the rate of 45% and not 40%. In response, Fairmont contends it paid Kliger an additional 5% while employed at Fairmont, but that the APA does not support Kliger's contention that the higher rate must be paid post-termination. Moreover, that the integration clause in the APA stating that this "agreement may not be altered or varied except in writing signed by both parties" precludes Kliger's position that the additional 5% must be paid post-termination.

Kliger also seeks summary judgment on his claim for declaratory judgment regarding the "Lakewood Agreement." On or around December 1, 2005, Kliger and Fairmont entered into the Lakewood Agreement," which provides for Kliger to receive $1,000 per month going up to $2,000 per month for managing Fairmont's Lakewood, New Jersey office. In addition to the monthly salary, the relevant paragraph provides that:

---

[2] Kliger references Licht's testimony in which he states that he knew of no case at Fairmont where a producer of $10 million in revenues or more did not receive the extra 5%.

15

"Kliger will earn the 10% override on any new Producer whom he manages, should he choose to do so. After the expiration of this agreement, if Kliger is no longer the manager, the agency reserves the right to move any future policies written by the salespeople to a new manager. Kliger will continue to receive the override on any existing policies."

According to Kliger, the Lakewood Agreement does not restrict his entitlement to the override to continued employment. He thus asserts that he is entitled to the override on any existing policy that continues to generate revenue for Fairmont from the Lakewood office, which Fairmont has not paid since his termination.

In response, Fairmont submits Kliger was no longer the manager of the Lakewood branch as of February 2023, and thereafter, all renewal policies were paid directly to the producers with no further overrides to the new manager. Fairmont contends that Kliger was paid on the existing policies and, as of March 23, 2023, there remained no existing policies that Kliger was entitled to receive any override. Fairmont further contends that Kliger is seeking overrides for commission on renewal policies, as opposed to existing ones, but that the Lakewood Agreement is silent about an extended payout post-termination for commissions that accrue after termination. In addition, that Kliger also seeks the monthly $2,000 salary for an indefinite period despite no longer being manager of the Lakewood branch. Because there is no provision in the APA providing for post-termination salary or commissions, Fairmont argues Kliger's claim under the Lakewood Agreement cannot be sustained. As such, that the court should dismiss Kliger's cause of action for declaratory judgement based upon the Lakewood Agreement.

Fairmont, in addition to seeking partial summary judgment, seeks an adverse inference against Kliger based on his alleged failure to produce documents and records related to premiums and payments that he or Creative received from pre-termination clients that left Fairmont and moved to Creative since February 2023. Fairmont contends this evidence is crucial, as Fairmont

16

[* 16]

and Kliger's damages cannot be properly calculated without these documents. As such, Fairmont argues that an adverse inference is warranted that the withheld records would show that Kliger fully mitigated his damages by diverting Fairmont's revenue to his own entity, or a preclusion order is warranted against his expert report.

In response, Kliger submits that he has complied with Fairmont's discovery requests, having produced, as late as January 2025, 12,000 additional documents bringing the total number of documents to 800,000. Kliger claims that Fairmont failed to raise any issues worthy of a motion about these latest productions until Kliger complained about Fairmont's failure to produce the critical documents demanded by Kliger, which were the commission statements that Fairmont refused to provide. Moreover, Kliger states that he produced both his personal tax returns and that of Creative's and that bank statements were subpoenaed and produced to Fairmont. Kliger also points out that the court addressed some of issues regarding the financial documents at a discovery conference on November 7, 2024, and by motion decision entered on December 20, 2024, and did not compel Kliger to produce redundant information.

Lastly, Kliger seeks dismissal of the third-party claims against Creative's employee, Drebin. Kliger argues that Drebin was dragged into this lawsuit merely because he is an employee and for no other reason. Further, that Fairmont has not proffered anything in the record that points to any participation or culpability on the part of Drebin.

## Discussion

It is well established that summary judgment is granted when "the proponent makes a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact, and the opponent fails to rebut that showing" (*Brandy B. v Eden Cent. School Dist.*, 15 NY3d 297, 302 [2010] [*quoting Alvarez v*

17

[* 17]

*Prospect Hosp.*, 68 NY2d 320, 324 [1986]]). Once the proponent has made a prima facie showing, the burden then shifts to the motion's opponent to present evidentiary facts in admissible form sufficient to raise a genuine, triable issue of fact (*Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]). If there is any doubt as to the existence of a triable fact, the motion for summary judgment must be denied (*Morejon v New York City Tr. Auth.*, 216 AD3d 134, 136 [2d Dept 2023] [citations omitted]).

*Bayrock and Sterling' Motions for Summary **Judgment***

The elements of a cause of action to recover damages for misappropriation of trade secrets are: (1) possession of a trade secret; and (2) use of that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means (*Photonics Indus. Intl., Inc. v Xiaojie Zhao*, 185 AD3d 1064, 1067 [2d Dept 2020] [citation omitted]). A trade secret includes any compilation of information which provides the company with an opportunity to obtain an advantage over competitors who do not know or use it (*Ashland Mgt. v Janien*, 82 NY2d 395, 407 [1993]). Although the names of insurance customers are not a trade secret (*Reidman Agency v Musnicki*, 79 AD2d 1094 [4th Dept 1981]), customer lists containing information relating to clients that is not readily known in the trade and that is discoverable only through effort are entitled to trade secret protection (*see Stanley Tulchin Assoc., Inc. v Vignola*, 186 AD2d 183, 185 [2d Dept 1992]; *see also Marcone APW, LLC v Servall Co.*, 85 AD3d 1693, 1695-1696 [4th Dept 2011]). "The question of whether or not a customer list is a trade secret is generally a question of fact" (*A.F.A. Tours, Inc. v Whitchurch*, 937 F2d 82, 89 [2d Cir 1991]).

Here, Bayrock and Sterling fail to establish that Fairmont's compilation of customer account information, which was accessible to Kliger through Fairmont's AMS, does not constitute a trade secret. Throughout this litigation, Kliger has strongly maintained that access to Fairmont's

18

[* 18]

AMS was essential to service his clients. Thus, it is clear that the information contained in Fairmont's AMS is not merely a list of customer names. Moreover, it is undisputed that access to AMS is password-protected and that Fairmont requires its employees to sign confidentiality agreements as part of their employment contracts.

Notwithstanding the foregoing, Bayrock and Sterling established the absence of the second prong. There is no indication in the record that Bayrock and Sterling used Fairmont's AMS information to their benefit (*see Falconwood Corp. v In-Touch Techs., Ltd.*, 227 AD2d 215, 216, [1st Dept 1996]). Further, a defendant will not be found to have used wrongful or improper means, even where the defendant knowingly receives trade secrets from a competitor's former employee who "voluntarily" appropriated the trade secrets (*see Schroeder v Pinterest Inc.*, 133 AD3d 12, 28 [1st Dept 2015]). Here, the only evidence in the record relates to Kliger voluntarily forwarding client information to Bayrock and Sterling on a handful of occasions. The foregoing is insufficient to raise an issue of fact regarding whether Bayrock or Sterling used Fairmont's "trade secrets."

For the same reason, Fairmont's third-party claim regarding violation of the DSTA fails. The court notes that neither side claims that the standard for misappropriation under the DSTA is easier to meet than under the state's common law. Under the DSTA, misappropriation is defined as "(1) the acquisition of a trade secret by a person who knew or had reason to know that the trade secret was acquired by improper means; or (2) the disclosure or use of a trade secret without express or implied consent by a person who acquired it through improper means" (*eShares, Inc. v Talton*, 727 F. Supp. 3d 463, 475 [SDNY 2024] [citing 18 USC § 1839(5)]). "'Improper means' under the DTSA includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy and espionage through electronic or other means...." (*id.*). Here, there is no evidence in the record that Bayrock and Sterling acquired Fairmont's trade secret by improper

19

means or that they used or disclosed any of Fairmont's trade secrets. As such, Bayrock and Sterling established their entitlement to summary judgment dismissing this claim as well.

Due to dismissal of the misappropriation claims under state and federal law, Fairmont's remaining third-party claim for a permanent injunction is unsustainable. As such, this claim is also dismissed. Based on the foregoing, there are no surviving third-party claims against Bayrock and Sterling.

Turning to Bayrock and Sterling's counterclaims, the DTSA provides, in relevant part, that a court may "award reasonable attorney's fees to the prevailing party" if "a claim of the misappropriation [of trade secrets] is made in bad faith" (*see* 18 USC § 1836(b)(3)(D)). The statute provides that bad faith "may be established by circumstantial evidence" (*id.*). "Bad faith" under the DSTA is shown where (1) plaintiff's suit is "objectively specious" and (2) plaintiff exhibited subjective bad faith in making the claim (*see Recoop LLC v Outliers Inc.*, 2025 U.S. Dist. LEXIS 117190, *48 [SDNY 2025]).

Here, neither Bayrock nor Sterling established its right to fees under the DSTA. Fairmont's claim is not yet objectively specious as to every element of a misappropriation claim since movants failed to establish, as a matter of law, that Fairmont lacked any protectible trade secret (*see id.*). In addition, Bayrock and Sterling fail to establish that Fairmont knew or was reckless in not knowing that its claim for trade secret misappropriation had no merit (*see id.* at 49-50). Thus, that part of Bayrock and Sterling's motions seeking summary judgment on their counterclaim is denied.

*Kliger Parties' and Fairmont's Motions for Summary Judgment*

It is well established that a written agreement that is complete, clear, and unambiguous on its face must be enforced to give effect to the meaning of its terms and the reasonable expectations of the parties (*Gertler v Davidoff Hutcher & Citron LLP*, 186 AD3d 801, 805 [2d Dept 2020]

20

[citations omitted]). "[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Willsey v Gjuraj*, 65 AD3d 1228, 1230 [2d Dept 2009] [internal quotation marks and external citations omitted]). "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (*W.W.W. Assocs. v Giancontieri*, 77 NY2d 157, 162 [1990] [citations omitted]). "[W]here two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect" (*LI Equity Network, LLC v Village in the Woods Owners Corp.*, 79 AD3d 26, 35 [2d Dept 2010] [citations omitted]).

Here, the court finds the APA is unambiguous regarding the following issues in dispute. First, the Handwritten Portion stating that "[i]f this agreement is terminated without cause, Associate Producer can still maintain book of business and receive 40% commission from this book" means that Kliger can obtain 40% commissions on his existing book of business, which, as asserted by Kliger, replaces the buy-out provision in the APA. To the extent Kliger's initial position in his complaint or the damages calculation conducted by Kliger's expert fails to align with this interpretation, that does not preclude the court from arriving at this conclusion. Moreover, "book of business" clearly refers to Kliger's pre-termination accounts with Fairmont. Fairmont fails to explain why Kliger's "book of business" cannot also mean Fairmont's clients/accounts. In addition, Fairmont fails to explain why the foregoing definition cannot co-exist with sections 5, 7, and 24 of the APA. The interpretation pressed by Fairmont, that "book of business" can only refer to future accounts placed with Fairmont by Kliger ignores completely the handwritten words "can still maintain" and does not make economic sense for the reason stated by

21

Kliger, i.e., if the clause pertains only to business that Kliger brought into Fairmont in the future, the Handwritten Portion would only be stating the obvious.

Notwithstanding the foregoing, there is nothing in the APA supporting Kliger's position that Fairmont is obligated to provide Kliger indefinite access to AMS post-termination to "maintain" the book of business. The APA does not require Fairmont to do so. The mere fact that AMS access would aid Kliger in servicing his "book of business" is not a basis to create an obligation in the APA that does not exist. There is also no support for Kliger's position that he is entitled to a commission rate of 45% post-termination since the Handwritten Portion unambiguously states 40%.

Turning to the Lakewood Agreement, Kliger seeks a declaratory judgment that he has a "continuing right under the Lakewood Agreement to payment from Fairmont of a monthly salary of $2,000 and a 10% overriding commission on insurance business placed by producers in Fairmont's Lakewood office." However, the Lakewood Agreement is clear that the monthly salary was for managing the Lakewood branch. Thus, there is no basis for Fairmont to pay Kliger a monthly salary when he is not a manager of the Lakewood office.

Regarding the override, the Lakewood Agreement provides that, where Kliger is no longer the manager, "Kliger will continue to receive the override on any existing policies." Fairmont insists that there are no "existing policies" and that Kliger is improperly seeking the override on "renewal" policies. However, Fairmont fails to establish as a matter of law that (1) there are no more "existing policies" as defined by Fairmont; and (2) that a renewal of an existing policy does not constitute an "existing policy" for the purpose of compensation under the Lakewood Agreement. In addition, given that the override is afforded to Kliger even when he is "no longer the manager," Fairmont fails to establish as a matter of law that Kliger would not be entitled to the

22

override on "existing policies" post-termination. Thus, whether Kliger is owed any override compensation under the Lakewood Agreement remains an issue for trial.

Turning to the enforceability of the APA's restrictive covenants, "[r]estrictive covenants contained in employment contracts are disfavored by the courts, and thus, are to be enforced only if reasonably limited temporally and geographically, and to the extent necessary to protect the employer's use of trade secrets or confidential customer information" (*Gilman & Ciocia, Inc. v Randello*, 55 AD3d 871, 872 [2d Dept 2008] [citations omitted]). "The employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment" (*BDO Seidman v Hirshberg*, 93 NY2d 382, 392 [1999] [citations omitted]). "A restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public" (*id.* at 388-389 [1999] [citations omitted]).

Here, Fairmont established that it has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of its clients, who have been maintained at its expense and to its competitive detriment (*see Davis v Marshall & Sterling, Inc.*, 217 AD3d 1073, 1076 [3d Dept 2023]). However, the subject restrictive covenant, to the extent that it bars solicitation or acceptance of business from any of Fairmont's clients, as opposed to solely those clients that worked with or had relationships with Kliger, is overbroad (*see Brown & Brown, Inc. v Johnson*, 25 NY3d 364, 370-371 [2015]; *see also BDO Seidman*, 93 NY2d at 392-393; *see also Good Energy, L.P. v Kosachuk*, 49 AD3d 331, 332 [1st Dept 2008]). Although Kliger also argues that the three-year duration of the restrictive covenants is overbroad, the court finds that three years is reasonable (*see Good Energy, L.P. v Kosachuk*, 49 AD3d at 332 [finding five-year restrictive

covenant reasonable in terms of duration]; *see also Gelder Medical Group v Webber*, 41 NY2d 680, 685 [1977] [finding it reasonable to limit the noncompetition term to five years]).

Where the "employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement [of a restrictive covenant] may be justified" (*BDO Seidman*, 93 NY2d at 394). "Courts regularly "blue pencil" non-solicitation restrictive covenants so that they only enjoin [a] former employee's solicitations of clients for whom the employee serviced" (*UMS Solutions, Inc. v Biosound Esaote, Inc.*, 2010 N.Y. Misc. LEXIS 7106, *80 [Sup Ct, Westchester Cty 2010] [citations omitted]).

Here, the instant matter is an appropriate case for the court to exercise its discretion and "blue line" the restrictive covenant so that it is narrowly tailored to protect Fairmont's legitimate interest in protecting the good will of the customers Kliger serviced. Thus, the restrictive covenant, at § 27(a), is modified to the extent that Kliger shall only be restricted from soliciting or accepting new or renewal business from those accounts at Fairmont that were produced by him. Kliger's argument that Fairmont cannot restrict him from accepting his former Fairmont clients that leave Fairmont voluntarily and not by his solicitation is not sufficiently supported.

To the extent Kliger argues that Fairmont's termination without cause bars its enforcement of the restrictive covenants, the court finds this assertion to be without merit (*see Davis v Marshall & Sterling, Inc.*, 217 AD3d at 1075 [finding that, because plaintiffs do not assert that defendant denied them access to any postemployment benefits that they are entitled to receive, *Post v Merrill Lynch, Pierce, Fenner & Smith*, 48 NY2d 847 [1979] is inapplicable and the circumstances of their terminations are irrelevant to the question of enforceability of the restrictive covenant]). This is

24

[* 24]

especially so where the APA, under the Handwritten Portion, provides for post-termination compensation to Kliger. In addition, although Kliger contends that the Handwritten Portion undermines the enforceability of the restrictive covenant, Kliger fails to adequately explain why the restrictive covenants and the Handwritten Portion cannot co-exist.

To the extent Kliger argues that the restrictive covenants are not enforceable due to Fairmont's breach of the APA, it is unclear which party breached the APA first and thus triable issues remain for resolution (*see Meteor Industries, Inc. v Metalloy Industries, Inc.*, 104 AD2d 440, 442 [2d Dept 1984]). Although Fairmont contends it did not breach the APA, Fairmont's failure to compensate Kliger pursuant to the Handwritten Portion constitutes a breach of the APA. However, Fairmont has demonstrated that Kliger breached the APA by disclosing confidential information to Creative, Bayrock and Sterling and by soliciting Fairmont's clients and informing them of his own brokerage, Creative, in breach of his duty of loyalty. Moreover, to the extent Kliger has accepted, through Creative, any of Fairmont's clients within his "book of business," Kliger is in breach of the APA's restrictive covenant. The timing of the foregoing events, however, is unclear. Accordingly, such issues are reserved for trial.

Lastly, that portion of the Kliger Parties' motion seeking dismissal of Fairmont's third-party complaint against Drebin is granted as Fairmont fails to meaningfully dispute that the relief is warranted. As for Fairmont's motion seeking certain adverse inferences due to Kliger's failure to provide discovery bearing on his damages, specifically, records related to premiums and payments that either Kliger or Creative received from pre-termination clients that left Fairmont and moved to Creative since February 2023, which has already been the subject of a motion to

25

[* 25]

strike filed by Fairmont under motion sequence 23,[3] the court finds that a striking of Kliger's pleadings, in whole or in part, would be the more appropriate relief. However, this issue shall be fleshed out on the record at a conference prior to trial.

### Conclusion

Based on the foregoing, the motions by Bayrock and Sterling (MS 24, 25, 28) seeking summary judgment is granted to the extent that the third-party complaint is dismissed as against them. The motions are otherwise denied. The motions by the Kliger Parties and Fairmont (MS 26 and 27) seeking summary judgment as against the other are granted to the extent indicated above and otherwise denied. In light of the rulings issued in this decision, the Kliger Parties and Fairmont shall stipulate to the outstanding issues remaining for trial and submit same to the court by March 11th. Any argument not explicitly addressed herein was considered and either deemed to be without merit or unnecessary to address in light of the court's determination.

E N T E R:

_____

Honorable Reginald A. Boddie
Justice, Supreme Court

**HON. REGINALD A. BODDIE**
**J.S.C.**

---

[3] By decision dated October 20, 2025, Kliger was directed to provide the outstanding discovery by November 6, 2025. In the event of such failure, the decision states that the "court may strike the pleading, award fees, or provide other relief without the need for an additional motion.

26